NATHAN CHAPMAN, plaintiff in error, *vs.* WARREN AKIN, defendant in error.

1. A *fi. fa.* levied upon real estate in 1859, unexplained, is not such presumptive evidence of payment as to prevent a levy on other property in 1867, when the *fi. fa.* is not dormant.

2. Akin held a judgment dated in 1859 against Stone ; Bronson, in December 1862, purchased the tract of land in dispute from Stone, *bona fide*, and went into possession, and afterwards sold it to Chapman, who succeeded him in the possession, which has been continuous from 1862 to the present time. In 1867, Akin had his *fi. fa.* levied on the land, and Chapman interposed his claim : *Held*, that Chapman, a *bona fide* purchaser, for a valuable consideration, with continuous and uninterrupted possession for more than four years, acquired title to the land, discharged from the lien of Akin's judgment.

3. The Supreme Court of this State having ruled, that the Stay-law was unconstitutional and void, under that ruling the plaintiff in *fi. fa.* was never under any legal disability to enforce the collection of the money due on his *fi. fa.* ; and as the law, as ruled by this Court, did not restrain a levy, the prescription did not cease to run in favor of the *bona fide* purchaser in possession ; and as the plaintiff was under no other legal disability to proceed with the *fi. fa.*, the lien of the judgment upon the land ceased to exist at the end of the four years possession.

4. Section 3525 of the Code is not classed with, and does not fall under the classification of a statute of limitation, and its running in favor of a *bona fide* purchaser was not suspended by the Acts suspending the running of the statute of limitations. The right, whatever it may be, of the plaintiff in *fi. fa.* to enforce his liens on the lands sold by the defendant, and held in possession by a *bona fide* purchaser, existed, with the condition annexed, that the levy be made within four years after the commencement of the possession, and as the plaintiff made no such levy, he lost his lien by failure to enforce it in accordance with the condition to which it was subject, and with which he never complied.

Claim.    Lien of judgment.    Decided by Judge WALKER, an attorney selected to try the cause.    Bartow Superior Court. March Term, 1868.

On the 23d of November, 1858, in Cass, (now Bartow) Inferior Court, D. L. and R. M. Wingard obtained two judgments against Joel Stone.    On each of these judgments a *fi. fa.* was issued on the 8th of December, 1858.    On the 27th of March, 1859, each of these *fi. fas.* were levied on land lots numbers 735, 777, 779, in the 17th section and 3d district of said county.    The plaintiffs transferred these *fi. fas.* to Warren Akin on the 17th of September, 1859.    On the 1st of April, 1863, Akin receipted Stone on each of said *fi. fas.* for the interest then due thereon.    On the 7th of October, 1867, Akin had these *fi. fas.* levied upon land lots, numbers 1026 and 1027 in said district and section, as the property of Stone.    There are other entries on said *fi. fas.* showing payments of costs, etc., but they are immaterial.

Nathan Chapman claimed the two lots last named, and at March Term, 1869, of the Superior Court of said county, he and Akin were at issue as to whether said lots were subject to said *fi. fas.*    The Judge having been of counsel in the cause, by consent, Judge D. A. Walker was selected to preside in this cause, and it was agreed that he should hear the evidence and direct the jury how to find.

On the trial, plaintiff introduced the *fi. fas.*, proved that Stone had been in possession of said two lots since the date of the *fi. fas.*, and closed.    Claimant's attorneys read in evidence a deed from Stone to Bronson, and from Bronson to Chapman for said lots, (their dates do not appear by the record,) and proved that Bronson's and his possession of said premises had been continuous from the 20th of December, 1862, till the trial.    Stone, the defendant in *fi. fas.*, was then offered as a witness to show that he was in possession of the three lots of land first levied on in 1859, and had been ever since, and that those three lots were worth sufficient to pay said *fi. fas.*    Upon objection made, the Judge ruled out this testimony.

Claimant then offered in evidence proceedings begun on the 18th of November, 1868, and ending on the 27th of that month, before the Ordinary of said county, showing that, on said last day, said lots, 1026 and 1027, had been set apart as Chapman's homestead, according to the Homestead-law of this State. The Court rejected this testimony because Chapman was not a defendant in the *fi. fas.* The evidence closed here. Claimant's counsel insisted that the said possession by Bronson and Chapman was a bar to the lien of said judgments. The Judge decided that the said two lots were subject to the *fi. fas.*, and the jury, under his direction, so found.

Chapman's counsel say that the Judge erred in rejecting Stone's testimony and the proceedings as to homestead, and in holding that said two lots were subject to said *fi. fas.*

W. T. WOFFORD, W. H. PRITCHETT, for plaintiff in error.

WARREN AKIN, L. E. BLECKLEY, for defendant in error.

BROWN, C. J.

1. We see no error in the ruling of the Court below, rejecting the testimony of Stone, as to the value of the three lots of land levied on in 1859. It is a well established rule in this Court that the levy of a *fi. fa.* upon lands unaccounted for is not *prima facie* evidence of satisfaction, and does not extinguish the judgment: 6 *Ga.*, 110; 14 *Ga.*, 77; 20 *Ga.*, 676.

2. Section 3525 of the Revised Code is in these words: "When any person has *bona fide*, and for a valuable consideration purchased real or personal property, and has been in the possession of such real property for four years, or of such personal property two years, the same shall be discharged from the lien of any judgment against the person from whom he purchased." The record in this case shows that Bronson purchased the land in dispute from Stone, the defendant, in *fi. fas.*, in 1862, for a valuable consideration, and went into possession. It is not pretended that he had any actual notice of the judgments against Stone, or that he

acted fraudulently, or in bad faith. He subsequently sold to Chapman, who, in like good faith, paid a valuable consideration for the land, and went into possession under his deed from Bronson. The possession was continuous from the purchase by Bronson till the levy ordered by Akin, in October, 1867, more than five years. The facts bring the case clearly within the statute, and a majority of this Court entertain no doubt that Chapman, after the expiration of the four years from the commencement of Bronson's possession, held the land discharged from the lien of the judgments which Akin controlled against Stone.

3. It was urged by the learned counsel for the defendant in error that the lien of the judgment was not discharged because the plaintiff in *fi. fas.* was prohibited from levying his *fi. fas.* during most of the period of the adverse possession, by the Acts of the Legislature, known as the Stay Laws, and more especially by the Act of March, 1866, which declares that "all statutes of limitation relating to liens *affected* by this Act shall be suspended," etc. If the Acts, known as the Stay Laws, had been sustained by this Court as valid and binding upon the people of this State, the position assumed would have been tenable. But this Court has held said Acts to be unconstitutional and void, and that it was the right of plaintiffs in *fi. fa.* to proceed and make their money by levy and sale during the period when it was expressly forbidden by the Stay Laws. See *Aycock et al., vs. Martin et al.*, 37 *Ga.*, 124.

I do not wish to be understood as yielding my assent to the decision of the majority of this Court in the case above cited. But its correctness was not questioned by the counsel for the defendant in error. Indeed, I understand them to approve that decision as sound law. As the Court below made no ruling upon that point in this case, the question is not now before us for review, and I yield to the authority of the decision until it is legally questioned. Taking this decision as law, it is very clear that there was never a moment when Colonel Akin labored under the slightest legal disability to enforce the collection of the money due him upon his

Chapman *vs.* Akin.

*fi. fas.* He is a lawyer of distinction, and has, I believe, from the beginning expressed the opinion that the Stay Laws were utterly *null* and *void*. It was his right to institute proceedings at any time to have them declared void by the Courts; and if he failed to do so, under his solemn convictions of their unconstitutionality, he can not now complain that he lost his rights by obedience to what he believed to be the laws of his State. Nor can the defendant in error in this case derive any aid from the provision in the Stay Law of 1866, above quoted, as it only suspended the Statutes of Limitations as to liens *affected* by that Act, and as the Act itself was, under the ruling of this Court, unconstitutional and void, it *affected* no lien, or any other right of the defendant in error. The Stay Law was either constitutional or it was not so. It was declared unconstitutional in the interest of creditors, and it is but just and fair that the authors and advocates of that decision should be bound by it, when it operates in favor of debtors, as well as when it serves the interest of creditors.

4. But it is insisted that section 3525 of the Code, above cited, is a statute of limitations, and that it was suspended during the war. In a certain loose, popular, sense it may be said to be a statute of limitations. But it is not so in any legal or technical sense. See *Battle vs. Shivers*, decided at this term. It is not classed under the head of limitations. It in no way affects the validity of plaintiff's judgment, or his right to enforce it, by the sale of any property of the defendant. It simply discharges the lien as against this property, which Chapman has honestly purchased and paid for, and innocently holds.

It was seriously urged that the right of the plaintiff in *fi. fas.* to enforce his judgment against all the property which may have belonged to the defendant, since the rendition of the judgments, is a right that cannot be divested by any default of the plaintiff short of the running of the Statute of Limitations against him. And it was claimed that his interest in the property of the defendant, by reason of his rights as a judgment creditor, amounts to *an estate;* and respectable

authorities are cited to sustain this view of the case. Admit it, and the enquiry arises, what sort of an estate is it? Is it an absolute, unconditional estate in the property of the defendant? I suppose no one will seriously insist that it is. If an estate at all, it is an estate with a *condition annexed*. And that condition requires, in case of a sale of land by the defendant to a *bona fide* purchaser for a valuable consideration, who is in possession of the land, that the plaintiff proceed by a levy within four years from the time when the possession commences, or the estate is divested, and the *bona fide* purchaser holds the land discharged from the lien of the judgment. In this view of the case, no legal disability whatever, except being *non compos mentis*, will relieve the plaintiff from failing to comply with the condition. See Revised Code, section 2271.

Another consideration should not be overlooked in this case. Chapman is an innocent purchaser for a valuable consideration, without any actual notice of Akin's judgments. Innocent *bona fide* purchasers are a favored class of litigants, both in Courts of Law and Courts of Equity. And neither the facts of this case, nor the practice of a large class of creditors during the war, calls upon the Courts to be astute in searching out reasons, or in finding rules, to enforce such liens as have remained inactive for a long time, at the expense of innocent purchasers for a valuable consideration, who have been in the quiet undisturbed possession of their lands for a number of years.

In closing this opinion, I would respectfully suggest to the General Assembly, the propriety of a change of our law in reference to the lien of judgments. If the proper entry is made upon an execution once in every seven years, it is never dormant, but its vitality is perpetual. The Statute of Limitations never commences to run against the judgment till dormant; and it holds lien upon all property in the hands of the defendant and upon all that may have passed through his hands, for the period mentioned in section 3525 of the Code. If the judgment becomes dormant, it loses its lien, and the Statute of Limitations then begins to run, and

Chapman *vs.* Akin.

bars it in three years, if proper proceeding are not commenced within that time to revive it. A defendant may be sued in the Justices Courts, in the Superior Courts, and in the United States Courts, and he may be sued as an endorser, for instance, in any other county in the State, as well as the county of his residence. A citizen of another State, or even a citizen of our own State, who is negotiating for the purchase of lands in Georgia, seldom knows whether he is getting a good title or not. Before he can be positive, unless he knows all about the vendors business, he must have searched the records of every county in the State. This is a practical impossibility. In my opinion, the law should require the plaintiff in *fi. fa.* to have his execution with the entries thereon at the time, recorded in each county, other than the county in which the judgment is rendered, where the defendant's property may be, before it takes lien upon the property there. This would be no great hardship on judgment creditors who do not wish to get satisfaction by entrapping or defranding the innocent, and it would afford purchasers an opportunity to protect themselves.

Let the judgment be reversed.

WARNER, J., dissenting.

In the case of *Battle vs. Shivers*, and in the case of Chapman vs. Aiken, the question involved was, whether the several statutes of this State, *limiting* the time within which judgment liens should be enforced, are *statutes of limitations*, and if so, whether the same were *suspended* during the war by the several Acts of the Legislature, enacted for that purpose. As both cases involve substantially the same principle, they will be considered together. It was conceded on the argument of both these cases, that if the statutes of limitations were applicable to the enforcement of judgment liens, then, these statutes were suspended from running during the war by the several Acts of the Legislature, and the Ordinance of the Convention of 1865, all of which were recognized and ratified by the Constitution of 1868, as valid laws. In order to *kill* and *destroy* these judgment liens, the ma-

jority of the Court held that the Statutes of Limitation heretofore enacted in this State, have no application to the *enforcement of judgment liens;* in other words, that the several statutes of this State, prescribing the time within which the holder of a judgment lien shall enforce it, or loose his lien on the defendant's property, are *statutes of limitation,* and therefore were *not suspended* during the war, by the several legislative enactments *suspending* the running of statutes of limitation.

By the Judiciary Act of 1799, judgments in this State, bound all the property of the defendant from the time of signing the same, and thereby created a *lien* upon his propproperty. The professional reader will readily perceive the distinction between the *lien* of a judgment, and *the remedy* provided by law for the *enforcement of that lien.* The lien of a judgment on the property of the defendant is one thing; the remedy to *enforce* that judgment lien is another, and quite a different thing. The remedy provided by law in this State, for the enforcement of a judgment lien against the property of the defendant is by a writ of *fieri facias,* commonly called an execution. See Revised Code, 3576. The levy and sale of the defendant's property, by the proper officer, by virtue of an *execution* in the manner prescribed, is *the remedy* provided by law to enforce the plaintiff's judgment lien. The Act of 1822-3 *limited* the time within which the plaintiff should sue out his execution upon his judgment to seven years from the date of the judgment, or if execution was sued out within that time and no return made thereon within seven years from the date of the judgment by the proper officer, then the judgment became dormant, and he could not enforce his *remedy.* The plaintiff's remedy to enforce his judgment lien was *limited* by the Act of 1822-3 to seven years from the date of his judgment, or seven years from the date of the last entry on the execution by the proper officer. Such was the first statute of limitations, prescribing the time within which the judgment creditor should enforce his *legal remedy,* or his judgment would become dormant. That Act did not defeat nor destroy his judgment debt, but only (like

every other statute of limitations) affected his *remedy* to enforce his judgment lien against the defendant's property.

In the case of *Griffin vs. McKenzie (7th Ga. R.,* 166) this Court said, in giving a construction to this same Act, "And we are of opinion, that there is nothing to prevent the Legislature from fixing a time within which an existing judgment shall be enforced, as well as to pass *any other Act of limitations.* Private justice, as well as public policy, authorize a period to be prescribed, to commence *in futuro,* in which *rights* shall be *enforced,* and to withhold *the remedy* after the lapse of the appointed time." In *Booth vs. Williams, 2nd Kelly's Report,* 255, in discussing the provisions of this Act of 1822, this Court said : " The intention of the Legislature was to impose *a limitation* on executions which had remained dormant for seven years, to prevent fraud." It did not occur to the mind of a single member of this Court, at that day and time, that this Act was not a statute of limitations, *limiting* the time within which a judgment creditor should enforce his *remedy by execution.*

In the year 1856, the General Assembly passed a general law upon the subject of the statute of limitations. It is entitled, "an Act limiting the time in which suits in the Courts of law in this State must be brought, and for other purposes therein mentioned." By the 8th section of that Act it is declared, "that no judgment hereafter obtained in the Courts of this State, shall be *enforced* after the expiration of seven years from the time of its rendition, when no execution has been issued upon it, and when execution has been issued, after the expiration of seven years from the time of the last entry upon the execution made by the officer authorized to execute and return the same." By the 29th section of the same Act, it is declared, " that when any person has *bona fide,* and for a valuable consideration, *purchased* real or personal property, and has been in possession of such real property for four years, it shall be discharged of the lien of any judgment which may exist against the person from whom he purchased. These two sections, embraced in this Statute of Limitations of 1856, have been incorporated into the Revised

Code : See sections 2863, 3525. In the one case, *the remedy* of the judgment creditor is barred after the lapse of seven years, and in the other, when land is in the possession of a *bona fide purchaser* for a valuable consideration for four years, the judgment creditor's *remedy* will be barred, if he does not enforce it within the four years. Seven years is *the limitation* prescribed by law for the judgment creditor to enforce his *remedy* in the one case, and four years is *the limitation* prescribed by law for the judgment creditor to enforce his *remedy* in the other. In both cases, the Statute *limits* the time within which the judgment creditor shall enforce his remedy as given to him by the law, and that remedy, as has been already shewn, is an execution to be levied on the defendant's property : that is *his remedy* prescribed by law to enforce his judgment lien. When *the Statute limits* the enforcement of *that remedy* to a definite period of time in both cases, if it is not a *statute of limitations,* what is it? The legal profession have always understood it to be statute of *limitations,* the Legislature has recognized it as a statute of *limitations,* this Court heretofore has considered it a statute of *limitations,* and to the common understanding of mankind in general it would appear to be upon its face a statute of limitations, *limiting the time* within which a judgment creditor should enforce his judgment lien, by the prosecution of *his remedy* furnished by the law for that purpose.

The 4th section of the Code declares, that all statutory enactments in this State shall be construed according to the ordinary signification of the words, except words of art, etc., and with reference to *the particular subject matter*.

The 3d section of the Act of 1866 shows, that the Legislature thought there was such a thing as a *statute of limitations* relating to *liens,* when it declares, "that all statutes of limitations relating to liens affected by this Act, shall be *suspended* during the continuance of the Act." It will be perceived, that the 3d section of the Act of 1866 (commonly known as the "Stay law") expressly suspended all statutes of limitations relating to liens affected by that Act. By the 1st section of the Act of 1866, all executions were to be

Chapman *vs.* Akin.

stayed until the first day of January, 1870; that was a *definite* period of time fixed for the operation of the Act upon executions issued upon judgments. It was, therefore, the declared *intention* of the Legislature to *suspend* the running of the Statute of Limitations relating to judgment liens until the first day of January, 1870, for that was the time fixed by the 1st section of the Act for its continuance. The intention of the Legislature is quite as clear and manifest as if it had been declared in so many words, that the statutes of limitations relating to liens should be *suspended* until the first day of January, 1870. The 1st section of the Act was to continue in force until the first day of January, 1870. The Statute of Limitations relating to liens affected by the Act was suspended until *that time.*

It is true, that the 1st and 4th sections of the Act of 1866, were declared by the judgment of this Court to be unconstitutional and void, but the 3rd section of that Act is *not unconstitutional,* and has never been declared to be so. That section of the Act remains *intact* as a valid law, and is a clear and indisputable manifestation of the intention of the Legislature, that the running of the Statute of Limitations as to judgment liens should be *suspended* until the first day of January, 1870. According to the provisions of the Act of 1866, therefore (independent of the other Acts of the Legislature suspending the running of the Statute of Limitations during the war), the time should not be counted against the defendants in error, from the date of *that* Act until the rendition of the judgment of this Court declaring the first and fourth sections thereof unconstitutional, taking the most *liberal* view of the question in favor of the plaintiffs in error.

What is a statute of limitations? By the common law, there was no stated or fixed time within which parties should prosecute their remedies for the enforcement of their legal rights, and the limitation was imposed by force of *divers Acts of Parliament,* 6th Bacon's Ab., 363, title, Limitation of Actions. In the case of the People vs. Gilbert (18th John Rep., 228), the Court said, " Limitations are created by and

derive their authority *from statute.*" The *limitation* on the judgment creditor's right to enforce his judgment lien, by the use of his appropriate legal remedy, is *created by statute,* and is therefore a "statute of limitations" in the strict sense of that term, and was *suspended* during the war by the several Acts of the Legislature enacted for that purpose, as well any other statute of limitations embraced in those several Acts.

The right of the judgment creditor to enforce his judgment lien by the legal process of the Court, is *limited* in the one case to seven years, and in the other to four years, and it is limited by *statute.* If this does not constitute a "*statute of limitations,*" what will? The words, "statutes of limitations," when named in these several Acts passed during the war, as well as in the Ordinance of 1865, included the Statute of Limitations applicable to the remedy for the enforcement of judgment liens in this State, as well as any *other statute of limitations.*

To undertake to demonstrate a proposition so plain, and one which nobody has questioned heretofore, is an *irksome* task. When the judgment creditor, after having forborne to enforce his remedy by the levy and sale of the defendant's property, relying upon the public law of the State (as he had the right to do), that the Statute of Limitations was *suspended* as to his rights and remedy, now to tell him, for the *first time,* that he must lose those rights and remedies, because the Statutes of Limitations applicable thereto were *not suspended as to him,* but were running against him all the time, constitutes an act of such gross and unparalleled injustice, that *mere words* are wholly inadequate to expose it. As it appears to be the *manifest will* to destroy the rights and remedies of judgment creditors, perhaps this is as *convenient a way* to do it as any other. Under such circumstances, the judgment creditor would naturally feel as a "certain man" may be supposed to have felt, who went from Jerusalem down to Jericho.

For the reasons stated, I am of opinion that the judgments of the Court below, in both cases, should be affirmed.